**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**LAWRENCE HAMMOND, JR.,**

      **Plaintiff,**

v.                                **Case No.: 3:11-cv-00871**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

      **Defendant.**

**<u>MEMORANDUM OPINION</u>**

      This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying plaintiff's application for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is presently before the Court on the parties' Motions for Judgment on the Pleadings. (ECF Nos. 14 and 17). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 7 and 8). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

## I.  <u>Procedural History</u>

      Plaintiff, Lawrence Hammond, Jr. (hereinafter referred to as "Claimant"), filed for DIB and SSI on August 26, 2009, (Tr. at 142, 146), alleging disability beginning on July

1, 2009[1] due to diabetes, carpal tunnel syndrome, right hand cyst, pancreatitis, elbow problems, high cholesterol, acid reflux, chronic back pain, and restless leg syndrome. (Tr. at 161). The Social Security Administration ("SSA") denied the application initially and upon reconsideration. (Tr. at 73, 78, 87, and 90). On March 17, 2010, Claimant filed a written request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 93). The administrative hearing was held on August 10, 2010 before the Honorable Caroline H. Beers, ALJ. (Tr. at 28-64). By decision dated August 30, 2010, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11-23).

The ALJ's decision became the final decision of the Commissioner on September 12, 2011 when the Appeals Council denied Claimant's request for review. (Tr. at 1-5). On November 10, 2011, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed his Answer and a Transcript of the Proceedings on January 10, 2012. (ECF Nos. 9 and 10). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 14 and 17). Accordingly, this matter is ripe for resolution.

## II.   __Claimant's Background__

Claimant was 47 years old at the time of his alleged disability onset. (Tr. at 35-36, 142). He is a high school graduate and communicates in English. (Tr. at 37). Claimant previously worked in a junkyard as a mechanic, (Tr. at 38), at Walmart stocking shelves, (Tr. at 39), and at a Pepsi Cola warehouse operating a forklift and loading products onto pallets. (Tr. at 40).

---

[1] Claimant amended his disability onset date to February 1, 2007 by motion and confirmed the amended date at the administrative hearing. (Tr. at 35-36, 155). The ALJ accepted the amendment after confirming that Claimant had not engaged in substantial gainful activity since February 1, 2007.  (Tr. at 13).

III.  **Relevant Medical Records**

The Court has reviewed the Transcript of Proceedings in its entirety including the medical records in evidence. Given that Claimant's challenges primarily involve his allegations of chronic pain in the neck, back, elbows, arms, right hand, and feet, the Court has confined its summary of Claimant's treatment and evaluations to those entries most relevant to the issues in dispute.

**A. Medical Treatment Records**

*1.      2004 – 2008*

On June 29, 2004, Claimant established primary care at Ebenezer Medical Outreach, seeing Laura Darby, R.N., a Certified Family Nurse Practitioner ("C-FNP"). (Tr. at 338-42). Claimant's primary concerns related to controlling his type II diabetes mellitus and hyperlipidemia (high cholesterol). (*Id.*). Claimant provided Nurse Darby with historical information, including a surgical history of right carpal tunnel release. Claimant also advised that he walked one to two miles each day for exercise, lived with his wife, had two grown sons, and was currently unemployed.  Nurse Darby performed a physical examination that was essentially negative for abnormalities. (*Id.*).

From June 2004 through November 2008, the bulk of Claimant's treatment notes pertain to managing his blood sugar levels, hyperlipidemia, and tobacco abuse. (Tr. at 297-342). However, on August 10, 2008, Claimant underwent a stress test to address complaints of chest discomfort. (Tr. at 309). The results were negative, and the cardiologist concluded that Claimant had "appropriate heart rate and blood pressure response to exercise." (Tr. at 308). On August 11, 2007, Claimant complained for the first time of a cyst on his right hand, which had been present for years. (Tr. at 316). He declined surgery due to the cost, and the treatment provider advised Claimant "to go to

the ER if [his] hand becomes very bothersome." (Tr. at 302, 315).

### 2.     2009

On May 7, 2009, Claimant sought emergency treatment at Cabell Huntington Hospital for minimal right elbow pain and minimal right elbow swelling. (Tr. at 237-54). The Emergency Department ("ED") physician documented that Claimant's range of motion of the elbow, the neurological functioning in his upper extremity, and his arm perfusion were all within normal limits. (Tr. at 238). Claimant was discharged with instructions to follow up with his primary care provider. (Tr. at 240-41). On May 12, 2009, in a follow-up appointment at Ebenezer Medical Outreach, Sara Lowe, R.N., C-FNP, observed that Claimant had decreased range of motion in his right elbow; swelling in the elbow, forearm, wrist, and hand with mild erythema. (Tr. 267). Nurse Lowe assessed Claimant with cellulitis (skin infection) and prescribed Levaquin and a Medrol pack.  She also arranged for Claimant to see Dr. Thomas Scott, a local orthopedist. (*Id.*). The next day, Claimant underwent x-rays of his right hand, wrist, forearm, and humerus at the request of Nurse Lowe. (Tr. 293-95, 365-67). The films showed no evidence of injury. (*Id.*). On May 21, 2009, Claimant presented to Dr. Scott, who diagnosed Claimant with an infection, as well as inflammatory olecranon bursitis of his right elbow without effusion. (Tr. 254). Dr. Scott prescribed an antibiotic and instructed Claimant to apply hot packs to his elbow for 72 hours. He opined that the condition would resolve and there would be "no need for further orthopedic follow-up." (*Id.*). On June 25, 2009, Dr. Scott confirmed that Claimant had normal function of his elbow and there was no evidence of effusion. (Tr. at 253).

Nevertheless, from June 2009 to August 2009, Claimant continued to report pain in his right elbow, then his left elbow, then both elbows, which Ebenezer Outreach

providers assessed as possible olecranon bursitis or cellulitis. (Tr. at 269-74). On August 5, 2009, Claimant sought urgent care at St. Mary's Medical Center. (Tr. at 255-65, 494-507). The treating Physician's Assistant noted that Claimant had left arm pain and cellulitis versus gout. Laboratory studies were normal and an x-ray indicated "no definite acute bony abnormality." (Tr. at 263, 265). Claimant was discharged and told to follow-up at Ebenezer Outreach. When Claimant's elbow pain persisted through October 2009, the Ebenezer Outreach providers ultimately assessed Claimant with neuropathy, pain uncontrolled. (Tr. at 275-79).

### 3.    2010

On January 2, 2010, Claimant sought emergency treatment from Cabell Huntington Hospital for syncope (fainting). (Tr. at 379). The ED physician determined that Claimant was experiencing tussive syncope, which is a brief loss of consciousness caused by paroxysms of coughing. (Tr. at 380, 384). He was discharged that same day and told to follow up with his primary care provider in two days or return to the hospital sooner if symptoms worsened. (Tr. at 381, 385).

Four days later, Claimant returned to Cabell Huntington Hospital for emergency treatment again related to syncope. (Tr. at 475-93). The ED physician's final report indicated that Claimant's "cardiomediastinal silhouette appears stable; The lungs are well inflated; Interstitial prominence is again seen; There are no pleural effusions." (Tr. at 492). Furthermore, a CT scan of Claimant's brain revealed "no abnormality of the brain or calvarium" with the reviewer noting that "the ventricles are normal in size and there is no evidence of intracranial hematoma or hemorrhage." (Tr. at 493). Claimant's physical examination was entirely normal, as was an EKG. (Tr. at 490-91). Claimant was diagnosed with tussive syncope and was discharged with instructions to follow up with

his primary care provider. (Tr. at 491).

Throughout 2010, Claimant received medical treatment for several relatively minor complaints, including management of his diabetes and cholesterol, (Tr. at 455-56), mild sleeping and breathing issues, (Tr. at 511), routine physicals (Tr. at 516-17), a stubbed toe, (Tr. at 469), and lymph node enlargement with no evidence of malignancy. (Tr. at 519, 539-40). In May 2010, Claimant underwent pulmonary function studies that showed a mild obstructive impairment. A month later, he completed in a sleep study, which was negative for obstructive sleep apnea but revealed a mild nonapneic oxygen desaturation. (Tr. at 511-13).

In August 2010, Claimant transferred his primary care to University Physicians & Surgeons. (Tr. at 517). At his initial visit, he advised that he had no acute complaints although his chronic medical conditions included asthma, esophageal reflux, hyperlipidemia, type II diabetes mellitus, and diabetic peripheral neuropathy. The examining physician, Dr. John Parker, noted that Claimant's asthma and esophageal reflux were well-controlled on medication, but his diabetes was poorly controlled. Dr. Parker planned to obtain Claimant's records from Ebenezer Outreach and re-evaluate his current treatment regimen. (Tr. at 520). Over the next two months, the providers at University Physicians & Surgeons worked with Claimant to stabilize his chronic medical conditions. Claimant's most significant problems during this period related to asthma, coughing and breathing. (Tr. at 513, 525-28, 532, 542-553, 561-63, 573-76, and 583-86). Despite Claimant's persistent complaints of asthma and coughing, however, medical examinations consistently showed mild or no abnormalities with Claimant's chest, lungs and cardiovascular system. (Tr. at 513, 518, 519, 520, 522, 526-27, 530, 534-35, 542-43, 563, and 574-75).

### B.  Medical Evaluations and RFC Assessments

### 1.     *Agency Assessments*

On October 28, 2009, Kip Beard, M.D., completed an internal medicine examination at the request of the West Virginia Disability Determination Service. (Tr. at 343-48). Dr. Beard first reviewed Claimant's medical history. (Tr. at 343-45). Claimant reported an ongoing history of pancreatitis, diabetes, lower back pain, carpal tunnel syndrome, and elbow swelling, as well as past conditions including restless legs syndrome, gastroesophageal reflux disease, and hypercholesterolemia. (Tr. at 343-44). Dr. Beard then conducted a physical examination of Claimant. (Tr. at 345). He noted nothing abnormal in Claimant's neck or cervical spine, and found that "[e]valuation of motion revealed no limitation." (Tr. at 346). Dr. Beard found tenderness in both of Claimant's elbows and "some pain" on motion testing, but confirmed "no redness, warmth, or swelling" and "normal motion." (*Id.*). Dr. Beard found "no tenderness, redness, warmth or swelling" in Claimant's hands, as well as no atrophy. (*Id.*). Although Dr. Beard observed "some early Dupuytren about the fourth flexor tendon more prominent on the right with a nodule formation," his "[e]valuation of range of motion revealed no limitations." (*Id.*). Likewise, Claimant's feet and ankles showed no redness, warmth, swelling, tenderness, or any limitations on range of motion. (Tr. at 347). Regarding Claimant's lumbosacral spine and hips, Dr. Beard observed "complaints of some mild pain on forward bending" and "some paravertebral tenderness without spasm with normal motion." (*Id.*). Claimant appears to have experienced some "mild back pain" during a supine straight leg raise test. (*Id.*). Claimant's left hip was normal, but his right hip caused him mild pain during motion testing. (*Id.*). Dr. Beard's diagnostic impression of Claimant was for chronic pancreatitis, diabetes mellitus type 2,

chronic thoracolumbar strain, carpal tunnel syndrome, possible right lateral and left medial epicondylitis, early Dupuytren's[2] right greater than left hand, and possible right hip osteoarthritis. (Tr. at 347-48). Significantly, Dr. Beard observed that Claimant's "gait was not neuropathic" and that although Claimant suffered from early Dupuytren deformity, it did not affect range of motion at this point. (*Id.*). Regarding Claimant's back, Dr. Beard observed "some pain, tenderness, and preserved motion," but nevertheless reported "negative straight leg raising," "symmetric reflexes," and "no radiculopathy" (type of neuropathy). (*Id.*). Finally, Dr. Beard noted that Claimant's elbow tenderness was "suggestive of tendinitis." (*Id.*). An x-ray confirmed that Claimant's lumbar spine was normal. (Tr. at 349).

On November 19, 2009, Thomas Lauderman, D.O., completed a Physical RFC Assessment at the request of the Social Security Administration. (Tr. at 350-57). Dr. Lauderman determined that Claimant could occasionally lift up to 20 pounds, frequently lift up to 10 pounds, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, and that his ability to push and/or pull (including operation of hand and/or foot controls) was unlimited. (Tr. at 351). Dr. Lauderman further determined that Claimant could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but that he could never climb ladders, ropes, or scaffolds. (Tr. at 352). Finally, Dr. Lauderman established environmental limitations of

---

[2] Dupuytren's contracture is a painless thickening and contracture of tissue beneath the palm and fingers. Risk factors include diabetes, and the condition is more common in people over 40, affecting men more often than women. The condition begins with small nodules or lumps, which thicken over time to a cord-like band. Treatment includes exercises, warm water baths, splints, injections of collagenase, and surgery in severe cases. The condition progresses at an unpredictable rate and may ultimately impair the function of the affected hand. *PubMed.* A.D.A.M. Medical Encyclopedia. © 2012, A.D.A.M., Inc.

avoiding concentrated exposure to extreme cold and extreme heat, and avoiding all exposure to hazards. (Tr. at 354). In the section reserved for additional comments, Dr. Lauderman deemed Claimant to be only "partially credible." (Tr. at 357).

On March 10, 2010, Narendra Parikshak, M.D., completed a second Physical RFC Assessment at the request of the Social Security Administration after Claimant had submitted additional medical records from Ebenezer Medical Outreach. (Tr. at 432-39). Dr. Parikshak affirmed Dr. Lauderman's RFC assessment, finding nothing to warrant increased limitations. (Tr. at 437). Dr. Parikshak noted that the clinical evaluation failed to reveal any significant problems with gait, range of movement, or strength. (*Id.*).

### 2. *Claimant-Referral Assessment*

On July 28, 2010, Bruce Guberman, M.D., completed an RFC evaluation, apparently at the request of Claimant's attorney, after reviewing Claimant's medical records. (Tr. at 460). Dr. Guberman noted Claimant's history of diabetes with the probable complication of neuropathy; hypertension; elevated lipids; multiple joint symptoms; shortness of breath and chronic cough; pancreatitis with acid reflux; restless leg syndrome; and a right hand cyst that Dr. Beard diagnosed as Dupuymen's contracture. (Tr. at 461). Based upon his review, Dr. Guberman determined that Claimant had "severe limitations in his ability to perform work-related activities." (*Id.*). According to Dr. Guberman, Claimant could occasionally lift 10 pounds, frequently lift less than 10 pounds, stand and/or walk 2 hours per workday, sit for 3 hours per workday, needed to alternate between sitting and standing every 30 to 45 minutes, and had "limited upper" and "limited lower" abilities to push and/or pull. (Tr. at 463). Additionally, Dr. Guberman opined that Claimant could never balance, stoop, kneel, crouch, crawl, or climb ladders/ropers/scaffolds, but could occasionally claim ramps

and stairs. (*Id.*). Dr. Guberman determined that Claimant was restricted in his ability to finger and reach in all directions, although his handling and feeling abilities were unlimited. (*Id.*). Further, Dr. Guberman felt that Claimant should avoid all exposure to extreme cold, extreme heat, vibration, fumes and odors, hazards, machinery, and heights and moderate exposure to wetness and humidity. (*Id.*).

## IV.   <u>Summary of ALJ's Findings</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, then the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's

ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). In the fourth step, the ALJ ascertains whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability and the burden shifts to the Commissioner to prove the final step. *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful activity, while taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirement of the Social Security Act through September 30, 2012. (Tr. at 13, Finding No. 1). The ALJ then acknowledged that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since February 1, 2007, the alleged date of disability onset. (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of: obesity, chronic pancreatitis, diabetes mellitus, chronic thoracolumbar strain, carpal tunnel syndrome, hyperlipidemia, asthma, and arthritis in the right elbow. (Tr. at 14, Finding No. 3). The ALJ considered Claimant's complaints of a cyst on his right hand, acid reflux, and

restless leg syndrome but found these impairments to be non-severe. (*Id.*).

At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any impairment contained in the Listing. (Tr. at 15, Finding No. 4). The ALJ then found that Claimant had the following RFC:

> [C]laimant has the residual functional capacity to perform less than light work and can occasionally balance, climb stairs, stoop, kneel, crouch, and crawl. The claimant can never climb ladders, ropes, or scaffolds. The claimant can occasionally push and or pull with the right upper extremity (he is right hand dominant). The claimant must avoid concentrated exposure to extreme heat, cold, odors, fumes, gasses, dusts, poor ventilation and exposure to hazards such as moving machinery and heights.

(Tr. at 16, Finding No. 5). As a result, under the fourth inquiry, Claimant was found unable to return to his past relevant employment. (Tr. at 21, Finding No. 6). Although the ALJ indicated that Claimant was 50 years old at the time of the alleged disability onset date, this appears to be a typographical error.[3] (Tr. at 21, Finding No. 7). Claimant was 47 years old at the time of the alleged onset of disability, which qualified him as a "younger individual age 18-49." (*Id.*). His age category subsequently changed to a "person closely approaching advanced age." (*Id.*). He had at least a high school education and could communicate in English. (*Id.*, Finding No. 8). The ALJ found that transferability of job skills was not an issue, because the Medical-Vocational Rules supported a finding of "not disabled" regardless of transferability of skills. (*Id.*, Finding No. 9). The ALJ considered all of these factors and, relying upon the testimony of a vocational expert, determined that Claimant could perform the various occupations that existed in significant numbers in the national and regional economy. (*Id.*, Finding No. 10). At the light level, Claimant could function as a counter clerk, marker/labeler, and

---

[3] In his initial applications for Social Security Income and Disability Insurance Benefits, Claimant listed his disability onset date as July 31, 2009. (Tr. at 142, 146). Claimant subsequently amended his disability onset date to February 1, 2007. (Tr. at 155).

retail sales attendant; at the sedentary level, Claimant was capable of performing jobs such as inspector, order clerk, and charting clerk. (Tr. at 22). On this basis, the ALJ concluded that Claimant was not under a disability as defined by the Social Security Act. (Tr. at 23, Finding No. 11).

## V.    <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant raises two challenges to the Commissioner's decision. First, Claimant argues that the ALJ failed to develop the medical evidence regarding Claimant's chronic pain in his lower back, right hand, elbows, and feet caused by carpal tunnel syndrome, cubital tunnel syndrome, and diabetic neuropathy. (ECF No. 14 at 12). Second, Claimant contends that the ALJ did not properly consider the combined effect of all of Claimant's impairments when comparing the severity of his conditions to the criteria of the Listing. (*Id.* at 13).

## VI.    <u>Scope of Review</u>

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. The Fourth Circuit has defined substantial evidence as:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is

limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

The Court has considered both of Claimant's challenges in turn and finds them unpersuasive. To the contrary, having scrutinized the record as a whole, the Court concludes that the decision of the Commissioner finding Claimant not disabled is supported by substantial evidence.

## VII.   <u>Analysis</u>

### A. Duty to Develop the Record

Claimant contends that the ALJ failed to fully develop the record regarding his chronic pain and related RFC limitations. (ECF No. 14 at 12). In Claimant's view, the ALJ completely ignored Claimant's testimony, disregarded Dr. Guberman's opinion, and improperly asked general and open-ended questions at the hearing "contrary to the regulations required to fully develop the Social Security Administration's pain listing." (*Id.* at 13). In response, the Commissioner asserts that the ALJ had no duty to further develop the record as both the burden of production and the burden of proof rested with Claimant, who was represented by counsel at the administrative level. (ECF No. 17 at 8-9). The Commissioner additionally argues that Claimant fails to make the requisite showing of actual prejudice, emphasizing that Claimant neither articulated "what a

more fully developed record might have shown," nor submitted new evidence warranting remand. (*Id.* at 10). According to the Commissioner, the record reflects all relevant facts and that Claimant had a full opportunity to ask questions and tender evidence to the ALJ. (*Id.* at 11).

It is well established that an ALJ has a duty to fully and fairly develop the record. *Cook v. Heckler*, 783 F.2d 1168 (4th Cir. 1986). Nonetheless, the ALJ need not "go to inordinate lengths" to construct a claimant's case in order to fulfill that duty. *Craft v. Apfel*, 1998 WL 702296, at *3 (4th Cir. Oct. 6, 1998) (internal quotation marks omitted) (unpublished). Moreover, a claimant represented by counsel may not "rest on the record ... and later fault the ALJ for not performing a more exhaustive investigation." *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir.2008); see also Social Security Act, § 223(d)(5)(B), 42 U.S.C.A. § 423(d)(5)(B); 20 C.F.R. § 404.1512(d). An ALJ is not required to act as a claimant's counsel; instead, his or her obligation is to collect enough evidence to allow for the issuance of a fair and reasoned decision on the claimant's application for benefits. *Bell v. Chater*, No. 95-1089, 1995 WL 347142, at *4 (4th Cir. Jun. 9, 1995) (quoting *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994)) (unpublished); *see also Reed v. Massanari*, 270 F.3d 838, 841 (9th Cir. 2001); *Haley v. Massanari*, 258 F.3d 742, 749 (8th Cir. 2001); *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir.2000). Contrary to Claimant's suggestion, an ALJ is not limited in the extent or type of questions he or she asks of the witnesses at the administrative hearing; particularly, as the ALJ's goal is to understand the claimant's allegations and apply the Social Security rules and regulations to the operative facts.

When considering whether the record before an ALJ was adequate, a reviewing court looks for evidentiary gaps that resulted in "unfairness or clear prejudice" to the

claimant, and remand is warranted only when the absence of available documentation creates a likelihood of prejudice. *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir.1995). The burden to establish disability rests with the claimant. Thus, to successfully demonstrate that the ALJ relied on an insufficient record, the claimant must "indicate what evidence the ALJ failed to seek," *Rose v. Commissioner of Social Security*, No. 98-2169, 1999 WL 147618, at *2 (4th Cir. Mar. 18, 1999) (unpublished), and "how [the evidence] would have impacted the ALJ's assessment." *Bell*, 1995 WL 347142, at *5. Simply stated, the claimant is required to make a showing of how he or she was prejudiced by the ALJ's alleged failure to fully develop the evidence. *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000).[4]

In the present case, the record before the ALJ was more than adequate to establish the severity and functional limitations of Claimant's chronic pain in his low back, neck, elbows, joints, right hand, and feet secondary to his diabetic neuropathy, carpal tunnel syndrome, and cubital tunnel syndrome. The ALJ had access to detailed records of examinations, assessments, consultations, agency evaluations, and laboratory and radiological studies that spanned the period from June 2004 through September 2010. These records provide a clear picture of Claimant's medical conditions as they existed, waxed and waned, during the alleged period of disability. No perceptible gaps

---

[4] The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") holds consistently with other Circuit Courts that the claimant must demonstrate prejudice from an allegedly undeveloped record in order to warrant a remand. *See McCrea v. Astrue*, 407 Fed. Appx. 394, 397 (11th Cir. 2011) ("Remand for further development of the record is appropriate when there are evidentiary gaps that result in prejudice."); *Jolivette v. Astrue*, 332 Fed. Appx. 326, 327 (7th Cir. 2009) (rejecting claim due to claimant's failure to establish prejudice); *Gabor v. Barnhart*, 221 Fed. Appx. 548, 551 (9th Cir. 2007) ("[Claimant] has not demonstrated prejudice so remand based on the ALJ's failure to develop the record is unwarranted."); *Carey*, 230 F.3d at 142 ("To establish prejudice, a claimant must demonstrate that he or she could and would have adduced evidence that might have altered the result."); *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995) ("[R]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial.").

exist in the chronology. In addition, Claimant's testimony during the administrative hearing supplemented the written records with ample information regarding the pain that he experienced, which the ALJ thoroughly addressed in her written opinion. Furthermore, Claimant makes no effort in his brief to identify additional evidence that the ALJ could or should have sought and provides no explanation as to how this evidence would have affected the ALJ's determination. Accordingly, the Court finds no basis upon which to conclude that the record was inadequate or that Claimant was prejudiced by the absence of available evidence that was crucial to a fair determination.

Although Claimant frames his challenge in terms of the adequacy of the record, his criticism is more properly construed as a disagreement with the weight that the ALJ allocated to his testimony and the opinions of Dr Guberman. However, this criticism is equally unfounded. Contrary to Claimant's assertion, the ALJ did not simply ignore his testimony or Dr. Guberman's RFC opinion. (Pl.'s Br. at 13). Instead, the ALJ appropriately weighed the medical source opinions and made credibility determinations as required by the Social Security regulations and rulings.

20 C.F.R. §§ 404.1527, 416.927 outline how an ALJ will evaluate opinion evidence in determining disability. In general, the ALJ will give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight will be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). In the absence of a treating physician's opinion that has been afforded controlling weight, the ALJ must analyze and weigh all of the medical source opinions in the record, taking into account the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6);

416.927(c)(2)-(6).  These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. When the opinions of agency experts are considered, the ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources." 20 C.F.R. § 404.1527.  Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, resolve conflicts of evidence, *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990), and give good reasons in the written decision for the weight given to the opinions.  *Id.* §§ 404.1527(e)(2)(ii); 416.927(e)(2)(ii).

In regard to Dr. Guberman's opinion, the ALJ explained that she gave it little weight "because [Dr. Guberman] did not examine the claimant and his opinions are not consistent with the treatment notes at Ebenezer Clinic or with the finding of examining physician Dr. Beard." (Tr. at 20). The ALJ explicitly stated that she allotted greater weight to the opinion of Dr. Beard, as he was an examining source, and to Dr. Scott, who treated Claimant and was a orthopedic specialist. Furthermore, the ALJ found that Dr. Guberman "provided no basis for limiting the claimant's hand functions," as he failed to "cite any confirming diagnosis or treatment notes or examining consultative examiner" supporting such a limitation. (*Id.*). The record reflects that Dr. Guberman's RFC opinion was inconsistent with the RFC opinions of Dr. Lauderman and Dr. Parikshak, both of whom found Claimant to be far less limited in nearly every functional area. (Tr. at 350-58, 432-40). Consequently, the record unequivocally established that the ALJ fully considered Dr. Guberman's opinion, weighed it based upon the factors set forth in the

regulations, and explained the reasons for affording it little weight. Thus, the ALJ followed the appropriate process, and her final assessment of Dr. Guberman's opinion is supported by substantial evidence in the record.

The ALJ likewise abided by the Social Security regulations and rulings in assessing Claimant's chronic pain. In *Hines v. Barnhart,* the Fourth Circuit reiterated its long-held standard governing the role of subjective evidence in proving the intensity, persistence, and disabling effects of pain, stating "[b]ecause pain is not readily susceptible of objective proof, however, *the absence of objective medical evidence of the intensity, degree or functional effect of pain is not determinative."* 453 F.3d at 564–565 (emphasis in original). Once an underlying condition capable of eliciting pain is established by objective medical evidence, disabling pain can be proven by subjective evidence alone. Of course, the extent to which an individual's statements can be relied upon as probative of the degree or functional effect of chronic pain depends upon the individual's credibility. "In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true." SSR 96-7p, 1996 WL 374186 *4. For that reason, the ALJ must assess and consider the credibility of the claimant when determining the weight to give to his statements about the intensity, degree, or functional impact of pain.

Social Security Ruling 96-7p provides guidance on how an ALJ should evaluate pain in order to determine its limiting effects on a claimant. First, the ALJ must establish whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. SSR 96-7P. Once the ALJ finds that the conditions could be expected to produce

the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* Whenever the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by a claimant to support the alleged disabling effects. The Ruling sets forth the factors that the ALJ should consider in assessing the claimant's credibility, emphasizing the importance of explaining the reasons supporting the credibility determination. In performing this evaluation, the ALJ must take into consideration "all the available evidence," including: the claimant's subjective complaints; claimant's medical history, medical signs, and laboratory findings;[5] any objective medical evidence of pain[6]  (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, the location, duration, frequency and intensity of symptoms; precipitating and aggravating factors; any medical treatment taken to alleviate it; and other factors relating to functional limitations and restrictions.[7] *Craig v. Cather*, 76 F.3d 585, 595 (4th Cir. 1996). In *Hines*, the Fourth Circuit Court of Appeals stated,

> [a]lthough a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

---

[5] *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1).

[6] *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2).

[7] *See* 20 C.F.R. §§ 416.929(c)(3) & 404.1529(c)(3).

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ.

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court is not charged with simply replacing its own credibility assessments for those of the ALJ; rather, the Court must review the evidence to determine if it is sufficient to support the ALJ's conclusions. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence ... or substitute its own judgment for that of the Commissioner." *Hays v. Sullivan,* 907 F.2d. 1453, 1456 (4th Cir. 1990). Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989–990 (4th Cir. 1984) (citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976)).

Here, the ALJ provided a detailed overview of Claimant's testimony, which she compared against the relevant medical evidence in order to assess Claimant's credibility. (Tr. at 16-19). Significantly, Claimant's complaints of chronic and debilitating pain in his lower back, neck and spine, elbows, hands, and feet, were simply inconsistent with the results of Dr. Beard's physical examination, which reported "some mild pain" but otherwise "normal lumbar spine" (lower back); "no spinous process or muscular tenderness" and "no evidence of muscular spasm" (cervical spine and neck); tenderness and "some mild pain on motion testing," but "no redness, warmth, or swelling" and "normal motion" (elbows); range of motion preserved and no tenderness, redness, warmth, swelling, or atrophy (hands); and no tenderness, redness, warmth, swelling, or

limitations on range of motion, and that Claimant's "gait was not neuropathic" (feet). (Tr. at 346-49). Similarly, Claimant's testimony that "the medication he takes causes him drowsiness and dizziness" was entirely unsubstantiated by the record, which contained no reference in any medical treatment note corroborating that Claimant suffered such side effects on a persistent basis. The ALJ concluded that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are credible to the extent they are consistent with the above residual function capacity assessment." (Tr. at 19). Despite specifically finding that "the claimant's allegations regarding the severity of his elbow limitations is *[sic]* exaggerated," the ALJ did accommodate Claimant's complaints by restricting him to "occasionally push[ing] and or pull[ing] with the right upper extremity." (Tr. at 16, 20). This limitation is generous when considering that Claimant's medical treatment for elbow pain was minimal and conservative. (Tr. at 234-54, 255-65, 265-70, 273-79, 293-95, 365-67, 494-507). Furthermore, it displays the ALJ's attention to Claimant's subjective complaints.

The ALJ conducted a thorough analysis of the relevant evidence and provided a logical basis for the weight given to various statements and opinions when crafting Claimant's RFC. Consequently, the Court finds that the ALJ followed the proper agency procedures in assessing credibility and weighing medical source opinions and her ultimate RFC finding was supported by substantial evidence.

### B. Combined Effect of Impairments

Claimant argues that the ALJ failed to consider and properly evaluate the combined effect of his impairments. (ECF No. 14 at 13). Specifically, Claimant contends that "the totality of the claimant's medical problems, when combined, totally disable him and meet or exceed the combination of impairments listing." *(Id.* at 14).

A determination of disability may be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment included in the Listing. The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." 20 C.F.R. §§ 404.1525, 419.925. Because the Listing is designed to identify those individuals whose medical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to meet the statutory standard of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Given that the Listing establishes disability, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Zebley*, 493 U.S. at 530.

To demonstrate medical equivalency to a listed impairment, a claimant must present evidence that his impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a listed impairment. *Id.* at 520; *See also* 20 C.F.R. §§ 404.1526, 416.926. Under the applicable regulations, the ALJ may find medical equivalence in one of three ways: (1) if the claimant has an impairment that is described in the Listing, but (i) does not exhibit all of the findings specified in the listing, or (ii) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, equivalency can be established if the claimant has other findings related to the impairment that are at least of equal medical significance to the required criteria;[8] (2) if the claimant's impairment is

---

[8] *Id.* §§ 404.1526(b)(1); 416.926(b)(1)

not described in the Listing, equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a similar listed impairment;[9] or (3) if the claimant has a combination of impairments, no one of which meets a listing, equivalency can be proven by comparing the claimant's findings to the most closely analogous listings.[10] If the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar listing. *Id.* However, the ALJ "will not substitute [a claimant's] allegations of pain or other symptoms for a missing or deficient sign or laboratory finding" in determining whether a claimant's symptoms, signs, and laboratory findings are medically equal to those of a listed impairment. *Id.*

As the Supreme Court explained in *Zebley*, "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment ... A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531. Ultimately, to determine whether a combination of impairments equals the severity criteria of a listed impairment, the signs, symptoms, and laboratory data of the combined impairments must be compared to the severity criteria of the Listing. "The functional consequences of the impairments ... irrespective of their nature or extent, *cannot* justify a determination of equivalence." *Id.* at 532

---

[9] *Id.* §§ 404.1526(b)(2), 416.926(b)(2)

[10] *Id.* §§ 404.1526(b)(3), 416.926(b)(3)

(citing SSR 83-19).[11]

In the present case, the ALJ determined that Claimant suffered from the severe impairments of obesity, chronic pancreatitis, diabetes mellitus, chronic thoracolumbar strain, carpal tunnel syndrome, hyperlipidemia, asthma, and arthritis in the right elbow; and that Claimant's cyst on his right hand, acid reflux, restless leg syndrome, and history of passing out were non-severe impairments. (Tr. at 14-15). Claimant fails to identify any listed impairment that he might satisfy based upon his combination of severe and non-severe impairments,[12] and cites only generally to Dr. Guberman's opinion in support of his argument that "the combined effect of [his] severe physicial impairments render *[sic]* him unable to function for 8 hours in any type of job." (Tr. at 14). On the other hand, the ALJ expressly identified the listed impairments that she considered and explained why Claimant's combined impairments did not meet or medically equal any of them, including: Listing 1.02 (Major dysfunction of joints), Listing 1.04 (Disorders of the spine), Listing 3.02 (Chronic pulmonary insufficiency), Listing 3.03 (Asthma), 4.04 (Ischemic heart disease), Listing 9.08 (Diabetes mellitis), Listing 11.14 (Peripheral neuropathies), or Listing 13.20 (Pancreas). (Tr. at 15).

Substantial evidence supports the ALJ's conclusion that Claimant did not satisfy any of the relevant listings. First, Dr. Beard found only minor spine abnormalities and joint dysfunction. (Tr. at 346-47). Likewise, Dr. Rubenstein found Claimant to have a "normal lumbar spine." (Tr. at 349). Subsequent treatment notes fail to indicate any abnormalities with Claimant's neck and musculoskeletal system. (Tr. at 522, 526-27,

---

[11] SSR 83-19 has been rescinded and replaced with SSR 91-7c, which addresses only medical equivalence in the context of SSI benefits for children. However, the explanation of medical equivalency contained in *Sullivan v. Zembly* remains relevant to this case.

[12] Although Claimant refers in his brief to "the combination of impairments listing," no such listing exists. (Tr. at 14).

530, 533-34, 562-63, 567, 574-75, and 584-85). Second, Dr. Beard found no abnormalities regarding Claimant's chest or cardiovascular functioning, nor did Claimant himself report any pulmonary or cardiovascular difficulties during the examination. (Tr. at 345-46). Moreover, despite Claimant's subsequent complaints of asthma and related symptoms, Claimant's primary care providers' treatment notes consistently reflected mild or no abnormalities with Claimant's chest, lungs and cardiovascular system. (Tr. at 513, 518, 519, 520, 522, 526-27, 530, 534-35, 542-43, 563, and 574-75). Third, regarding Claimant's diabetes and related neuropathy, Dr. Beard found that Claimant's "gait was not neuropathic." (Tr. at 348). Although some subsequent treatment notes from University Physicians & Surgeons cursorily list neuropathy as one of Claimant's "Active Problems," (Tr. at 521, 529, 532, 561, and 569), Claimant's physical examinations reflect no significant abnormalities or findings. (Tr. at 522, 530, 534, 563, and 567). Finally, Dr. Beard found that Claimant's most recent episode of acute pancreatitis occurred three years prior to his evaluation, while Claimant's only potentially pancreas-related ongoing symptoms were "acid reflux and some ongoing epigastric discomfort." (Tr. at 348). Subsequent treatment records from University Physicians & Surgeons consistently reported Claimant's abdomen as normal. (Tr. at 522, 527, 530, 534, 563, 567, and 575). Nothing in the record indicates that any combination of Claimant's symptoms was equal in severity or duration to the criteria of any relevant listed impairment.

To the extent that Claimant argues that the overall functional consequence of his combined impairments meets the statutory definition of disability, this contention also must fail. The Fourth Circuit stated in *Walker v. Bowen,* "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be

disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." 889 F.2d 47, 50 (4th Cir. 1989). The social security regulations provide that:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. §§ 404.1523, 416.923. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim*, 495 F.2d at 398. The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir. 1985). The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

An examination of the ALJ's RFC finding confirms that she fully considered the exertional and non-exertional limitations that resulted from Claimant's medically determinable impairments and accounted for their cumulative impact on his ability to perform basic work activities. In addition, the ALJ provided a thorough review of the objective medical evidence, the subjective statements of Claimant, and the opinion evidence supporting the RFC finding. (Tr. at 16-21). The ALJ restricted Claimant to less than light exertional work in light of his chronic health conditions and also limited him to only occasional pushing and/or pulling with the right upper extremity, noting that

Claimant was right-handed. Taking into consideration Claimant's musculoskeletal impairments, the ALJ confined Claimant to only occasional balancing, climbing stairs, stooping, kneeling, crouching, and crawling and allowed no climbing of ladders, ropes or scaffolds. (Tr. at 16). The ALJ considered Claimant's environmental limitations related to asthma, hypertension, and coughing, reducing his exposure to negative environmental factors such as extreme temperatures, odors, fumes, gasses, dusts, poor ventilation, as well as hazards such as machinery and heights. Moreover, at the administrative hearing, the ALJ presented the vocational expert with hypothetical questions that required the expert to take into account Claimant's limitations in combination. (Tr. at 59-60). Despite being asked to assume all of these restrictions, the vocational expert opined that Claimant could perform such light and sedentary work of a counter clerk, marker or labeler, retail sales attendant, inspector, order clerk, and charting clerk. (Tr. at 60). Even when asked by the ALJ to assume that Claimant was further restricted to "occasional handling with his right arm," the vocational expert confirmed that this restriction would "essentially preclude all of the light jobs" but would not significantly impact the available sedentary jobs. (Tr. at 61). Specifically, the vocational expert estimated only a 50% reduction in inspector jobs. (*Id.*). The ALJ's conclusion that Claimant's combination of impairments was not so severe as to preclude him from engaging in substantial gainful activity is amply supported by the evidence of record. Accordingly, the undersigned is satisfied that the ALJ adequately considered and accounted for the overall functional impact of Claimant's combined impairments.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment

Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:** September 19, 2012.

_____
Cheryl A. Eifert
United States Magistrate Judge